## IN EQUITY.

SAMUEL SLOCUM and ROBERT S. SLOCUM vs. GEORGE W. GLASS et al.

As purchaser of property at a master's sale, under a decree of foreclosure, who by misrepresentation and deception induced the mortgagor, previous to the sale, to leave the matter in the purchaser's hands to attend to, with a request from the mortgagor that he would pay the master's fees (which was all there was due on the decree, the mortgagor having settled all but such fees) and stop the sale, or at least get the sale adjourned for him—if such fees were not paid, and the purchaser attended the sale, and appeared to represent the interest of the mortgagor, made no offer to pay the master's fees, or to get the sale adjourned, but gave the master to understand that the sale would take place at the hour, which it accordingly did—and the purchaser bid off the premises for a nominal sum, comparatively—*held*, that such sale be set aside, and that the purchaser pay all the costs thereof, and the costs of the motion to get rid of it, to be taxed.

*September Special Term*, 1847. *Rensselaer county.*—A motion was made by the Defendant, Glass, to set aside a master's sale, made under a

decree of foreclosure in this cause, on the 13th of July last. The mortgage, upon which the decree of foreclosure was made, was executed by Glass to one Ross, and by him assigned to the Plaintiffs. It was dated July 24, 1844, and executed to secure the sum of $800, payable in three annual instalments with interest. The first instalment was paid. The bill was filed after the second instalment became due.

On the 4th of June last, John W. Bates became the assignee of the decree, and on the 3d of July following, Glass gave Bates a draft upon a mercantile firm in New York, payable on the 10th day of the same month, for the whole amount due upon the decree, including all costs, except the master's fees upon the proceedings under the decree for a sale. Glass was in New York when the draft became due, and knew of its payment. On the 12th of July, Glass went to Troy, where the master who had advertised the sale resided, for the purpose of paying his fees. He found the master at his house and informed him he had come to settle his fees. The master told him the bill was at his office, that he could not then go there, but he expected his son to return soon, and when he came he would have him call on Glass with the bill, at his lodgings in Troy. Glass waited until late that evening, expecting the bill of fees to be sent, and being obliged to return home, some twenty miles from Troy, early next morning, he called on Daniel Wight, a merchant of Troy, with whom he had extensive dealings, and stated to him the circumstances in relation to the proceedings under the decree. The statements of Glass and Wight, as to what was said at the interview between them, were in some respects contradictory. Glass stated, that he told Wight that he wanted to leave money with him to pay the master's fees; that he wanted him to see the master before ten o'clock the next morning, and pay the fees and stop the sale, and that he thought he had better leave with him $25 for that purpose; that Wight told him he need not leave any money, that he thought the fees could not be more than $10; that he would attend to the business in the morning and pay the fees whatever they were, and that Glass might hand him the amount when he was next at Troy. Wight denied that he agreed to see the master in the morning and pay him his fees and stop the sale or anything to that effect, or that Glass told him he thought he had better leave with him $25 to pay the fees. He admitted the amount of the fees was the subject of conversation, and they both thought it could not exceed $10; but he said he only undertook, on that occasion, to attend the sale in the morning, and, in case it should be adjourned, to pay the amount of the master's fees for the adjournment of sale.

Early the next morning, Glass left for home, and when he was about a mile from Troy he was ovetaken by the son of the master with the bill of fees, he having called at his lodgings and found he had just left for home, had followed him.  Glass told him he had made arrangements with Wight to settle the bill, and thereupon he returned to Troy and called at Wight's store expecting to receive payment of the bill, but Wight was absent.  The sale being advertised to take place at ten o'clock that morning, the master and his son attended at the place appointed, and a few minutes after, Wight came there, and upon being asked by the master whether the sale was to go on, he replied, that he supposed it was.  He said nothing about paying the master's fees and did not ask for a postponement of the sale.  The master then put up the property for sale in three parcels and the whole was bid in by Wight for the aggregate sum of $139, and the master had since executed and delivered to him a deed pursuant to the sale.

The property was worth from two to three thousand dollars.  Bates, the owner of the decree, swore that, on the 10th of July, he told the master that Glass had given a draft for the debt and costs, which would undoubtedly be paid that day, and that there need be no sale ; and that not suspecting that a sale would possibly take place under the circumstances, he paid no further attention to the business.  A few days after the sale Glass, having learned of the sale and the purchase by Wight, called on him and offered to pay him the amount he had advanced, and requested him to give up the sale.  Wight told him, he thought it would be for his interest, that he should hold the title until they had a settlement.  Afterwards Glass, with his counsel, again called on Wight and tendered the amount of his bids with interest, and requested him to consent that the sale be opened, or to convey the premises to Glass. He refused, and said he should do nothing about the business.  He also pretended that he had sold the property, and given his bond for a deed, but refused to tell to whom he had made the sale.

It was shown upon the motion, that there was a large unsettled account between Glass and Wight, upon which Glass was largely indebted, and that Wight held against Glass a judgment for $5000, which Glass had confessed several years previous as security for such indebtedness.

J. D. WILLARD, *for Glass.*

J. S. OLIN, *for Wight.*

HARRIS, Justice.—It is unnecessary to examine the objections taken to the regularity of the proceedings previous to the sale.  Though those

proceedings may have been perfectly regular, it is impossible to sustain this sale upon any principle which a court of equity has ever applied in similar cases. If we look to the price for which the property was sold, it is so inconsiderable, compared with its acknowledged value, that a common sense of justice would exclaim against allowing the purchaser to take advantage of such sale. If we look to its effect upon the mortgagor and those who, as creditors, must share in his losses, sound policy seems to demand that they should be protected against so needless a sacrifice. If we regard the interest of him who stands in the place of the mortgagee, we see that by sustaining this sale, he is, without any apparent fault or negligence on his part, to be deprived of all security for the remaining instalment upon his mortgage. If we regard the circumstances of the case, we do not find that gross negligence, nor that absolute inability to prevent a sale, on the part of the mortgagor, which, in some cases of extreme hardship, have rendered it impossible to grant relief upon any recognised principle of equity. So far from being chargeable with negligence, we find the mortgagor exercising great vigilance in his efforts to prevent the sale. And so far from his being unable to prevent it, he is found paying, several days before the time appointed for the sale, the whole amount due for debt and costs, only omitting the master's fees, because the amount was not ascertained. And then, as though he would leave nothing undone to guard against the possibility of a sale, we find the mortgagor going, the day before the sale was to take place, twenty or thirty miles, to Troy, and seeking the master for the sole purpose of paying his fees, and then, when he finds himself unable to ascertain the amount of those fees, so that he can pay them before he is obliged to return home, we find him seeking one whom he, at least, regarded as his friend, and with whom, as it appears, he had long had extensive business transactions, and disclosing to him the object of his journey to Troy. Whatever was said at that interview, it cannot be doubted that Glass left Wight with entire confidence that he would take care of his interests, and that a sale of his property would be prevented. If indeed, Wight did not undertake with Glass to pay the master's fees and stop the sale, he at least made such statements as had the effect to mislead Glass and induce him to leave Wight, and subsequently to leave Troy, with a full reliance that the object of his visit had been effectually accomplished, and that in no event would a sale take place. The whole conduct of Glass forbids the conclusion that he would have left while he supposed there was a possibility of a sale of his property.

And yet the sale did take place. How was it brought about, and by

whose procurement? Bates, the owner of the decree, has sworn that he did not dream that by possibility the sale could take place. Glass had gone home secure in the belief that he had done all that was necessary to arrest all further proceedings. And yet the property was sold, and the friend to whom Glass had applied to assist him in preventing the sale, and who himself admits that he did undertake with Glass that in case the sale could be adjourned, he would pay the fees of adjournment, is the only person instrumental in procuring the sale to take place, and then, for a mere nominal price, becomes the purchaser of the whole property. He attended the sale, as we have the right to infer, in consequence of the understanding between him and Glass. It is evident, from the course pursued by the master, that he regarded Wight as representing the interests of Glass. When inquired of by the master, what was to be done in relation to the sale, instead of applying for an adjournment, as even according to his own account of the understanding between him and Glass, good faith required him to do, we find him making such a reply to the master as evidently induced him to believe that, since Glass had called on him the evening before to settle the fees, he had changed his purpose, and had sent his friend to attend the sale for the purpose of becoming the purchaser of the property. Had Wight come to the sale an utter stranger to the parties— had he purchased the property as a mere adventurer, even then, this would be a case for relief according to every rule of equity which has ever been applied to cases of this description. In such a case, however, relief would only be granted upon condition of indemnity to the purchaser. But in this case, so far from providing indemnity for the purchaser in setting aside the sale, I think it a proper case to charge upon the purchaser the expenses of the sale and the costs to which he has unconscientiously subjected the mortgagor in getting rid of the sale. The title was unfairly acquired by him, and when applied to and requested to relinquish what in good conscience he had no right to, he unjustly refuses and endeavors to throw obstacles in the way of the mortgagor's obtaining the property by a false pretense of having sold it. If he did not intentionally deceive Glass, he must, at least, have been aware that Glass had been misled by what had passed between them, and under such circumstances, common fairness should have dictated to him that he had no right to make a profit or derive any personal advantage against Glass out of the transaction.

An order must be entered setting aside the sale of the 13th of July, and directing that the purchaser, Daniel Wight, pay the costs of the sale and subsequent proceedings, and also the costs of this motion to be taxed.